**TOWN OF SUMMERSVILLE, WEST VIRGINIA, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent, Friends of the Earth, Intervenor.**

No. 84–1517.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 10, 1985.

Decided Jan. 10, 1986.

George F. Bruder, Washington, D.C., for petitioner.

Andrea Wolfman, Washington, D.C., for respondent. Jerome M. Feit, Sol. and John N. Estes, III, Atty., F.E.R.C., Washington, D.C., were on the brief for respondent.

Paula Dinerstein, Washington, D.C., for intervenor, Friends of the Earth.

Before WALD, GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This case represents a highwater mark in misunderstanding between a municipal applicant for a license for a hydroelectric dam and the Federal Energy Regulatory Commission (FERC or the Commission). The Town of Summersville, West Virginia (Summersville) challenges FERC's dismissal of Summersville's application for a license to develop a hydroelectric project on the Gauley River in West Virginia, a river presently under consideration for inclusion in the national wild and scenic rivers system. Although FERC is statutorily barred from licensing any hydroelectric project on the Gauley River until at least 1987, Summersville maintains that FERC acted arbitrarily and capriciously in refusing to hold its application in abeyance. Because we find that FERC neither had a prior policy of holding all such license applications in abeyance nor was required by statute or reason to do so in this case, we uphold its order dismissing Summersville's license application.

## I. THE STATUTORY BACKGROUND

Part I of the Federal Power Act authorizes FERC to license the construction and operation of nonfederal hydroelectric power facilities. 16 U.S.C. § 797(e). Prior to licensing, FERC may issue a preliminary permit for the study of a potential hydroelectric project site for a period not to exceed three years. 16 U.S.C. §§ 797(f), 798. The preliminary permit confers upon the permit holder a "priority of application" against potential competitors who might otherwise file a license application before the permittee can assess the feasibility of developing the chosen site.

The grant of a preliminary permit also gives the permittee certain advantages in the competitive proceedings at the licensing stage. Under the Commission's regulations, the holder of a preliminary permit will prevail over any competing license applicant, so long as the permittee's plans are "at least as well adapted" to the development of the project as those of its competitors. 18 C.F.R. § 4.33(h)(1) (1984). And even if a competitor presents a superior plan, FERC will give the permittee an opportunity to revise its own plan to bring it up to the level of the competitor's plan. 18 C.F.R. § 4.33(h)(2) (1984).

The Wild and Scenic Rivers Act (WSRA) limits FERC's authority to issue licenses under the Federal Power Act. *See* 16 U.S.C. §§ 1271–1287. In the WSRA, Congress has designated over fifty rivers as components of the national "wild and scenic rivers system," 16 U.S.C. § 1274, and barred the Commission from licensing the construction of any hydroelectric project "on or directly affecting" any river within that system, 16 U.S.C. § 1278(a). The WSRA also provides that Congress may authorize the Secretary of Interior or the Secretary of Agriculture to study additional rivers for inclusion in the wild and scenic rivers system. After such a study, the Secretary submits a report, along with comments by other federal agencies and by state governors, to the President, who in turn makes a recommendation to Congress. The Congress then decides whether or not to designate the "study river" as a wild and scenic river. *See* 16 U.S.C. § 1275.

In order to preserve rivers in their natural state until Congress can decide whether to designate them as wild and scenic rivers, the WSRA prohibits FERC from licensing any power project construction "on or directly affecting" any study river. This licensing ban lasts for three years following Congress' designation of a river for study, unless Congress specifically provides an even longer period. An additional moratorium period, not to exceed three years, is then provided to permit Congress to consider any report submitted by the President. 16 U.S.C. § 1278(b).

## II. THE PROCEEDINGS BEFORE THE COMMISSION

The present case flows from Summersville's efforts to obtain a license for a hydroelectric project on the Gauley River in West Virginia. In 1978, Congress authorized a study of the Gauley for possible inclusion in the wild and scenic rivers system. 16 U.S.C. § 1276(a)(74). Congress provided that the President's report must be submitted to Congress by September of 1984.[1] *See* 16 U.S.C. § 1276(b)(3).

In September of 1980, Summersville applied for a preliminary permit[2] to study further development of the hydroelectric potential of the existing Summersville Dam on the Gauley River. Although Summersville did not originally inform FERC that the Gauley was a "study river," within a month of its original filing, the town submitted an exhibit to its application declaring that the project site was "included in a study of the Gauley River for possible designation as a wild and scenic river under the Wilderness Act." J.A. at 265.[3] The

---

1. The President did not actually forward his recommendation to Congress until April 26, 1985. This court notes but does not decide the issue of whether the three-year period for congressional consideration runs from the original due date of September 30, 1984 or from the date on which the President actually forwarded his recommendation.

2. The original application was filed jointly by Summersville and Noah Corporation. To ensure that Summersville could take advantage of a municipal preference given by FERC when awarding preliminary permits, Noah and Summersville dissolved their joint venture in Decem-

ber of 1980, and Summersville became the sole applicant for the permit. The propriety of FERC's decision to wait until the licensing stage to determine whether the joint venture had actually been terminated was upheld by this court in *City of Bedford v. FERC,* 718 F.2d 1164 (D.C. Cir.1983).

3. Summersville apparently confused the Wilderness Act, 16 U.S.C. §§ 1131–1136, with the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271–1287. The Wilderness Act designates certain areas within the national parks system as wilderness areas and bars any construction within such areas.

Commission issued Summersville a two-year permit in May of 1981. When Summersville filed a license application in November of 1982, it again informed the Commission that its project was located on a study river. Summersville revised its license application on June 27, 1983 to reflect the fact that a draft report by the Secretary of Interior did *not* recommend designation of the Gauley as a wild and scenic river. J.A. at 81. The Commission soon thereafter accepted for filing and began to process Summersville's license application. The Commission's letter of August 17, 1983 accepting the application asked Summersville to perform a cultural resource survey.

The Department of Interior submitted comments to FERC on Summersville's license application on January 16, 1984. Interior informed the Commission that "at present, FERC is prohibited by law from licensing any project on the Gauley River" because of the river's status as a potential wild and scenic river. J.A. at 168. The Commission received a competing license application in March of 1984 from Southeastern Renewable Resources, Inc. Two months later FERC dismissed both Summersville's and Southeastern's license applications as premature. FERC's original order dismissing the license applications explained that the statutory scheme of the WSRA vests the Secretary of Interior or Agriculture, depending on which department is administering the river, with the responsibility for determining whether a proposed project is consistent with the WSRA. As the Secretary of Interior had notified FERC that Summersville's project was on a study river, FERC was "precluded by law from considering license propos-

als for the site." *Town of Summersville,* 27 F.E.R.C. ¶ 61,206, at p. 61,402 (1984).

FERC's Order Denying Rehearing stated:

> Once it has been determined by an administering Secretary that a project is "on or directly affecting" a designated component of the [wild and scenic rivers] System or a study river, our jurisdiction to grant a license for the project is removed. While it is true that our jurisdiction to license projects on a particular study river may be reinstated should the Congress fail to make it a component of the System within a specified time period, nothing in the [WSRA] requires the Commission in the meantime to keep on file applications to develop projects on a study river. On the contrary, we conclude that the proper disposition of such applications is that they be dismissed as premature.

*Town of Summersville,* 28 F.E.R.C. ¶ 61,257, at p. 61,484 (1984).

The Commission rejected Summersville's contention that it had relied on FERC's issuance of a preliminary permit and its acceptance of Summersville's license application as proof of a policy allowing FERC to consider its license application despite the Gauley's status as a study river. The Commission stated that Summersville should have known that FERC lacked authority to license a project on a study river. According to FERC's opinion, its acceptance of Summersville's license application indicated only that the determination of whether the project would be "on or directly affecting" the Gauley River had not yet been made. Once the Secretary of Interior made that determination, FERC was entitled to dismiss Summersville's license application.[4]

---

4. After FERC dismissed Summersville's license application, Summersville filed a new preliminary permit application which is presently pending before the Commission. At oral argument this court requested supplemental briefing on possible mootness and was advised that FERC has announced in writing that it will not process Summersville's new application until this court resolves the status of the Commission's order dismissing Summersville's original license application. In its supplemental memo-

randum the Commission explained that there was no guarantee that Summersville's new permit application would result in a grant of a preliminary permit to Summersville. The memorandum also pointed out the difficulties that would arise if FERC issued a preliminary permit to a new developer only to have Summersville's first license application reinstated by this court. In light of these representations, we now turn to the merits of the case before us.

Summersville now petitions this court to set aside the Commission's orders as arbitrary and capricious. According to Summersville, FERC must hold in abeyance Summersville's license application until the status of the Gauley River has been conclusively determined by Congress. Summersville finds this obligation in FERC's issuance of a preliminary permit and its acceptance and processing of a license application for a project on a river whose study period it knew might run until 1987. Petitioner's core argument is that the Commission has departed from its past policy of holding in abeyance license applications on study rivers and is now retroactively applying new policies to Summersville. We find that these contentions do not hold water.

### III. ANALYSIS

#### A. *FERC's Purported Departure from Past Policy*

Summersville's principal argument presupposes an explicit FERC policy of entertaining license applications on study rivers.[5] Because we conclude that FERC had no such policy, we reject Summersville's argument that summary rejection of its license application constituted an unacknowledged and unreasoned departure from past commission policy.

Although Summersville can point to no prior FERC decisions holding license applications on study rivers in abeyance, Summersville argues that such a policy is implicit in FERC's decisions granting preliminary permits for projects on study rivers. For support, Summersville relies primarily on *City of Delta*, 4 F.E.R.C. ¶ 61,102 (1978), in which the Commission granted an application for a preliminary permit for a project on the Gunnison River. At the time FERC issued the permit, Congress had already directed the Secretary of Interior to prepare a report on the Gunnison by October of 1979. *See* 16 U.S.C. § 1276(a)(39), (b)(1). The Commission must have known, therefore, that Congress had until October of 1982 to consider the report. Because the three-year permit issued in *City of Delta* would expire a year ahead of that date, Summersville argues that FERC must have intended to keep the City of Delta's license application on file until the end of the statutorily provided study period. Otherwise, a preliminary permit on the study river would confer no meaningful "priority of application." To avoid rendering preliminary permits in such situations illusory, Summersville asks this court to find that FERC must have had an implicit policy of holding license applications on study rivers in abeyance.[6]

Summersville's reading of *City of Delta* is overflowing. It erroneously assumes that a preliminary permit on a study river can never develop into a license application capable of being processed under the Commission's standard timetable.[7] Summersville's argument reflects too stagnant a view of the licensing process under the Federal Power Act—that all conditions at

---

5. To entertain a license application on a study river requires the Commission to hold the application in an inactive status for an indefinite period since the Commission is statutorily precluded from going ahead and issuing a license for a project on a study river. *See* 16 U.S.C. § 1278(b).

6. Issuance of a preliminary permit in *City of Delta* may, of course, have been a mistake. In the other FERC decisions involving a preliminary permit for a project on a study river, the study status of the river would have statutorily terminated before the end of the preliminary permit period. *See, e.g.,* Gordon Falls Hydro Associates, 13 F.E.R.C. ¶ 62,263 (1980); City of Seattle, 6 F.E.R.C. ¶ 62,035 (1979). Many of these decisions involved study rivers under consideration by states rather than Congress. Under the WSRA, 16 U.S.C. § 1278(b)(ii), the study period for such rivers is only one year. *See, e.g.,* Mason County Pub. Util. Dist. No. 1, 17 F.E.R.C. ¶ 61,042 (1981); Mr. Robert W. Shaw, 6 F.E.R.C. ¶ 62,163 (1979) (river not yet even a study river).

7. Of course, if the maximum study period allowed by the WSRA terminated before the preliminary permit period, the license application would not be filed on a study river, and Section 7(b) of the WSRA would impose no bar to FERC's licensing activity. Our discussion, therefore, treats only the more difficult situation in which a preliminary permit period is shorter than the maximum length of the study period.

the preliminary permit stage will remain unchanged at the licensing stage. It overlooks crucial distinctions between the preliminary permit and license application stages of FERC's licensing process. A preliminary permit is issued to enable a permittee to study an inchoate proposal that may be licensed in the *future*. A license application, on the other hand, is an assessment of the *present* legality and feasibility of a definite project.

Critical alterations in course may develop so as to allow licensing of a project on a study river at the end of the preliminary permit period. First, the study status of a river may change in the intervening time period. Alternatively, the permittee, after collecting further information, may modify his proposed project design so that it is no longer "on or directly affecting" a river that continues to be a study river. FERC's licensing process has always anticipated such evolutions. Since, then, a final project might be licensed without the need for any abeyance period, we decline to read into FERC's policy of granting preliminary permits on study rivers an automatic policy of license application abeyances.

1. *Potential Change in "Study Status"*

The WSRA sets forth a maximum but no minimum period during which a river may remain under study. The study period, therefore, may come to a close before the maximum allowable time.[8] This could happen (1) if the President submitted his report to Congress before his statutory deadline; (2) if the Secretary of Interior exercised his discretion under 16 U.S.C. § 1278(b)(i) to cut short the study period by recommending to Congress that the river not be included in the wild and scenic rivers system; or (3) if Congress itself took less

than three years to make its final decision on a presidential recommendation.

At the preliminary permit stage, FERC does not scrutinize potential legal barriers which may arise to foreclose the issuance of a license. Unless a permanent legal barrier precludes FERC from licensing the project, FERC will issue a preliminary permit. *See Woods Creek, Inc.*, 19 F.E.R.C. ¶ 61,181 (1982). The Commission has issued a preliminary permit, for instance, when it knew congressional plans for federal development of the same site might well preclude private development. *See City of Santa Clara*, 19 F.E.R.C. ¶ 62,363 (1982). To issue a preliminary permit on a study river without allowing for an abeyance period at the licensing stage is in no way inconsistent with the Commission's policies.

2. *Potential Change in Project Design*

Summersville's attempted equation of licensability at the preliminary permit and license application stages also ignores another relevant fact. The project described in the license application often differs materially from the project described in the preliminary permit. At the time a preliminary permit is issued, it is quite possible that the permittee will be able to develop and submit a license application for a redesigned project that is not "on or directly affecting" the study river and that therefore need not be held in abeyance.

Summersville's assumption that the final hydroelectric project design will be the same as the design at the preliminary permit stage disregards the basic function of preliminary permits in FERC's power licensing scheme. The preliminary permit is actually only a minor threshold hurdle for the applicant, and the grant of a preliminary permit is in no respect an indication of

---

**8.** The study status of the Gauley River might well have terminated early. Because of the existing dam on the Gauley River, that portion of the river cannot meet the WSRA's requirement that a wild and scenic river be free of impoundments. *See* 16 U.S.C. § 1286(b). In the debates over the enactment of the WSRA, many congressional representatives expressed concern that the Act would impede development of rivers improperly designated as potential wild and scenic rivers. Sponsors of the Act, however, assured the Congress that the Act provided procedures by which such rivers could quickly be removed from study status. *See, e.g.,* 114 Cong.Rec. 26,592 (1968) (moratorium might last only a few months if study status obviously inappropriate).

the merits of a license proposal. The Commission does not hold an evidentiary hearing on the superiority, or even the feasibility, of a project at the preliminary permit stage. *See, e.g., Pacific Hydro, Inc.,* 28 F.E.R.C. ¶ 61,014, at p. 61,027 (1984); *Town of Madison Electric Works Department,* 11 F.E.R.C. ¶ 61,318 (1980). To the contrary, the purpose of the preliminary permit system is solely to allow a potential applicant to develop sufficient information to prepare a complete license application and to convince FERC at the licensing stage of the effectiveness and superiority of his proposed project. Because it is specifically aimed at encouraging further study, the grant of a preliminary permit necessarily recognizes the fluidity of the permittee's original proposal. *See e.g., Town of Madison Electric Works Department,* 11 F.E.R.C. ¶ 61,318 (1980).

The inevitable uncertainties surrounding any project for which a preliminary permit has been issued—uncertainties as to the shape of the eventual proposal or even its feasibility—mean that a policy of issuing preliminary permits for projects on study rivers cannot be viewed as equivalent to or even as a predictable forerunner of a policy of entertaining license applications on study rivers. There is simply nothing in the statutory scheme or in FERC's implementation of it to give ballast to Summersville's assumption that a permit for a project on a study river will always result in a license application that cannot be processed expeditiously but must be held in abeyance until the river's designation is finally determined.

### 3. Commission Resource Constraints

Constraints on agency resources also inhibit us from accepting Summersville's reading of FERC's preliminary permit policy as an implicit assurance that subsequent license applications will be entertained. The Commission's policies reflect a decision to devote minimal resources to examining preliminary permit applications. Permittees often find after further investigation that no project at the site is feasible. Be-cause of the high attrition rate, FERC has determined that the most efficient use of staff resources militates against any substantive investigation of legal or factual uncertainties at the preliminary permit stage. *See Pacific Hydro, Inc.,* 28 F.E.R.C. ¶ 61,014 (1984); *Consolidated Hydroelectric, Inc.,* 26 F.E.R.C. ¶ 61,192 (1984). We would hesitate, therefore, to mandate that a policy of issuing preliminary permits on study rivers must translate into a policy of entertaining license applications on study rivers. The Commission's option to perform its principal screening at the licensing phase has already been upheld by this court in *City of Bedford v. FERC,* 718 F.2d 1164 (D.C.Cir.1983).

### B. The Implications of Summersville's Receipt of a Preliminary Permit

In light of the above discussion, we swiftly reject Summersville's argument that FERC would never have issued it a preliminary permit if FERC had not intended to defer processing its license application until the status of the Gauley River was definitively resolved. The Commission's present policy is apparently to issue a preliminary permit unless it would under no circumstances be able to license a project. *Cf. City of Rohnert Park,* 26 F.E.R.C. ¶ 61,137 (1984) (granting preliminary permit for project on designated wild and scenic river where powerhouse might lie within protected area). From the information available at the time it issued the preliminary permit, FERC need not have concluded that no reasonable possibility existed that it would be able to license Summersville's project in 1983, when the preliminary permit expired. In its preliminary permit application, Summersville itself represented to FERC that it expected FERC's review process to take place within 21 months after the grant of the preliminary permit. *See* J.A. at 12. Summersville's representation was not obviously false: The WSRA's moratorium on licensing projects on the Gauley River might end before 1987, or Summersville might decide to relocate its project.

While FERC's grant of Summersville's preliminary permit when the Gauley River's study period could last until September of 1987 might, by itself, suggest that FERC had to contemplate the possibility or even probability of holding Summersville's license application in abeyance, there are other relevant circumstances in the case that vitiate such an intent. The Commission has in the past often issued permits for projects where the odds of a resulting licensable project were low, and its pronouncements consistently stress the provisional and preliminary aspect of preliminary permits. Moreover, Summersville could not reasonably have given great weight to FERC's failure to explicitly deny that it would hold a license application in abeyance. An abeyance would have been directly contrary to FERC's general policy of avoiding outdated or "stale" license applications as well as to the structure of the Federal Power Act. In its comments to the House Committee on Interior and Insular Affairs on the proposed Wild and Scenic Rivers Act, the Federal Power Commission (FPC, now FERC) endorsed an amendment to the bill which would have reduced the study period from five to two years whenever the FPA received a license application for a project on or affecting a study river. The purpose of the amendment (not substantially adopted) was to enable the Commission to process license applications "without any undue delay." H.R.Rep. No. 1623, 90th Cong., 2d Sess. 52. While the FPC did not at the time elaborate on the burdens imposed by delay, FERC has since explained that:

> Merely to suspend the processing for an indefinite time is not in the public inter-

est. The data that is necessary to support an application cannot just be stored for a period of years and then simply reactivated as is. Interim changes in relevant factors such as ... project costs would have to be evaluated, and the application may require substantial revision.

Nebraska Public Power District, 10 F.E.R.C. ¶ 61,272, at p. 61,527 (1980).

A commitment to suspend processing Summersville's license application until 1987 would in effect have extended by several years the "priority of application" conferred by Summersville's preliminary permit. The Federal Power Act specifically states, however, that a preliminary permit is "for the sole purpose of maintaining priority of application for a license" for a period "not exceeding a total of three years." 16 U.S.C. § 798.[9] Although in this case the statutory purpose of fostering immediate development of the nation's hydroelectric potential is not directly implicated since FERC may not license any project on a study river, Summersville should not have presumed that FERC would blithely ignore the clear words of its statute.

Given the existence of acceptable alternative interpretations of FERC's grant of a preliminary permit to Summersville, and absent any positive evidence suggesting that FERC intended to commit itself to defer processing Summersville's license application, we cannot accept Summersville's argument that the grant of the preliminary permit represented a commitment to hold the license application in abeyance.[10] We

---

**9.** As FERC has explained in a separate decision involving a request by a power company to halt the processing of its license application for up to three years:

> [I]t would be undesirable and inconsistent with the scheme of the Federal Power Act for [the applicant] to maintain priority of license application—a favored position over others who might come forward wishing to develop the available water power resources—for a project about which there are so many uncertainties and so much necessary information lacking. By holding this license application

in abeyance while [the applicant] makes additional studies and arrangements related to power marketing, need, and economic feasibility we would, in effect, be extending [the applicant's] preliminary permit far beyond the statutory maximum period of three years.

Nebraska Public Power District, 10 F.E.R.C. ¶ 61,272, at p. 61,527 (1980).

**10.** The two instances cited by Summersville in which FERC has held applications in abeyance do not compel a different conclusion. In each case, the applicant specifically requested FERC to defer processing its submission for the finite

do, however, assume that a genuine misunderstanding between Summersville and FERC occurred. Summersville read FERC's grant of its preliminary permit application as a broader commitment than FERC actually made. Absent some evidence that FERC's conduct was arbitrary, capricious or an abuse of discretion, however, we can afford no relief to Summersville.

### C. FERC's Purported Failure to Warn

Summersville raises intertwined arguments concerning FERC's purported failure to include appropriate warnings in Summersville's preliminary permit. First, Summersville claims that FERC should have made clear that it would not hold Summersville's license application in abeyance if the Gauley remained a study river. Second, Summersville asserts that FERC should have warned Summersville that its project must be redesigned so as not to be "on or directly affecting" a study river. Summersville has raised no estoppel argument but instead attempts to link these failures to warn either to an unexplained departure from agency policy or to an unjustifiable retroactive application of a new policy. We find petitioner's contentions unpersuasive.

#### 1. FERC's Silence Concerning Abeyance

In light of our conclusion, see supra Part III.A, that FERC had no policy of holding in abeyance license applications on study rivers, this first prong of Summersville's failure-to-warn argument can quickly be rejected. The burden is not on FERC to disclaim a discretionary power of abeyance

not required or even specifically authorized by statute or regulation. Summersville has not shown that FERC's actions here are in any case distinguishable from its general policy of issuing preliminary permits for projects where eventual licensability is problematic. Contrary to Summersville's assertion, FERC need not include a warning in a permit that a project can only be licensed under certain circumstances if, as discussed below, those circumstances are clear from the words of the statute.

#### 2. Failure to Warn that Project Must be Redesigned

Summersville raises a clearly related contention that FERC has adopted a "new" policy of including a warning in any preliminary permit to notify the permittee that any project on a study river must be redesigned so as not to be "on or directly affecting" the river. Summersville argues that the adoption of this new policy, in conjunction with the Commission's failure to give any warning to Summersville in its preliminary permit suggests that the Commission's policy at the time Summersville received its preliminary permit was to entertain license applications during the study period. See Town of Summersville's Answer to Supplemental Memorandum at 4.

We find Summersville's reliance on the so-called new "Modesto policy" misplaced.[11] Section 7 of the WSRA itself provides sufficient warning that FERC would not entertain license applications on study rivers unless redesigned. The cases relied on by Summersville are not to the contrary. For example, Summersville fails to appreciate

period of one year. Neither instance had anything to do with potential or designated wild and scenic rivers, and neither suggested any Commission policy or practice of routinely granting abeyances. See, e.g., JBC Hydro Tennessee, Ltd., 21 F.E.R.C. ¶ 61,113 (1982) (holding in abeyance initial preliminary permit applications). We find FERC's letter consenting to defer consideration of Ohio Power Company's application for a license for Gallipolis Project No. 2751 similarly unhelpful. The letter does not reveal whether or not Ohio Power filed its license application pursuant to a preliminary

permit. Although the letter does not set forth the circumstances leading to the deferral, it suggests that an unforeseen circumstance had arisen after FERC began processing the license application. FERC's usual response to such occurrences is to give the license applicant time to respond to the change.

**11.** Summersville traces this new policy to FERC's decision in Modesto Irrigation Dist., 17 F.E.R.C. ¶ 61,144 (1981).

that the statement in *Modesto Irrigation District,* 17 F.E.R.C. ¶ 61,144 (1981), that "Modesto is *on notice* that the Commission is without authority to license project works 'on or directly affecting'" wild and scenic rivers (emphasis supplied) is made in an *order denying an appeal* by an intervening party, not in the order issuing the preliminary permit to Modesto. The original grant of the preliminary permit says *nothing* about the effect of the WSRA. *See Modesto Irrigation District,* 16 F.E.R.C. ¶ 62,104 (1981). FERC's statement that "Modesto is on notice" refers to the notice provided by the words of the statute; the grant of the preliminary permit itself gives no other warning. The preliminary permits at issue in the other cases relied on by Summersville also contain no warnings. These cases, like *Modesto,* involved appeals rather than original preliminary permit grants. *See Capital Development Co.,* 25 F.E.R.C. ¶ 61,346 (1983); *Oroville-Wyandotte Irrigation District,* 19 F.E.R.C. ¶ 61,301 (1982). And in *Modesto and Turlock Irrigation Districts,* 23 F.E.R.C. ¶ 61,024 (1983), the case in which Summersville asserts that FERC first applied the "*Modesto* policy" to preliminary permits on study rivers, FERC merely quoted from its opinion in *City of Delta,* 4 F.E.R.C. ¶ 61,102 (1978) to the effect that the permittee is on notice that if the river eventually becomes a wild and scenic river FERC would be unable to license the project. *Modesto and Turlock* thus mandates no "new" warning.

We note finally that the express terms of Summersville's own preliminary permit should have provided sufficient warning to Summersville. Article 7 of the permit orders that the permittee shall:

consult with the appropriate Federal, State, and local agencies ... and shall fully explore all feasible alternatives to the project and alternative project designs, taking into account impacts on natural resources and other environmental values. These resources and values include, but are not limited to: ... *scenic and aesthetic values.* The Permittee shall ... [study] the impact of the construction and operation of the proposed project on these natural resources and values and measures needed to protect and develop them or to provide for their mitigation or replacement, *including alternative designs* and operational measures. ...

*City of Summersville,* 15 F.E.R.C. ¶ 62,218, at p. 63,385 (1981) (Order Issuing Preliminary Permit), *reprinted in* J.A. at 21–22 (emphasis supplied). We conclude, therefore, that even if FERC has now adopted a policy of including boilerplate language in preliminary permits to the effect that projects on study rivers must be redesigned, the terms of Summersville's own permit gave it sufficient notice that it should consider alternative project designs to avoid any impact on scenic and aesthetic values.

### D. *FERC's Acceptance of Summersville's License Application*

Finally, FERC's acceptance and preliminary processing of Summersville's license application is not sufficient evidence of any general Commission policy of holding in abeyance license applications on study rivers.[12] Summersville's contention that FERC would not have begun to process Summersville's license application had it not intended to hold its application in abeyance has some intuitive plausibility. FERC knew or should have known that Summersville's project was located at an existing dam on a study river. FERC could therefore have referred the application immediately to the Secretary of Interior for confirmation that the project was not licensable

---

12. In the course of processing Summersville's application, FERC requested Summersville to submit a cultural resource survey. *See* J.A. at 92–94. Such a survey is routinely required of all applicants pursuant to 18 C.F.R. § 4.31(f) (1984). Although FERC requested that this survey be provided within 120 days of the date FERC accepted Summersville's application for filing, *i.e.,* by December of 1983, Summersville did not submit the report until June of 1984, a month after FERC had already dismissed Summersville's license application. Summersville explicitly declines to raise an estoppel argument on this point and we will not advance one for it.

because "on or directly affecting" a study river. That it did not do so but instead asked Summersville to prepare a cultural resource survey suggests, according to Summersville, that FERC intended at the time to hold its license application in abeyance.

This argument, unfortunately, ignores the fundamental premise of Summersville's own license application. Summersville explicitly argued that Congress did not intend the WSRA to prohibit development at *existing* dams. Summersville's original license application announces up front that its "proposed development does not conflict with the possible designation of the Gauley as a 'Wild River.'" J.A. at 38. Summersville then proceeded to advance a project development schedule under which FERC's approval of the license application would be completed in 1983 and construction would take place from 1984 to 1986. J.A. at 49–50. Given Summersville's representations, we do not think FERC's acceptance of the application indicates a commitment to keep the application on file for an indefinite period should Summersville's assessment of the construction schedule prove false. Summersville's abandonment of its original legal theory does not convert FERC's acceptance of its application into a commitment to hold the application in abeyance. Summersville may well be correct that FERC erred in accepting a license application premised on an untenable legal theory. The best course may have been to summarily dismiss the license application at the outset. This court cannot conclude, however, that the remedy for the Commission's error is to hold in abeyance an application FERC should never have accepted.

Summersville argues that in seeking early licensing it did not *abandon* its claim to have its application held on file. This argument misses its mark. Summersville did not abandon its claim; instead, FERC rea-

sonably concluded that Summersville never made such a claim. We cannot fault FERC for interpreting Summersville's license application solely as a request for immediate processing. All of Summersville's communications to the Commission stressed a need for immediate approval of the application. *See, e.g.,* J.A. at 70, 75–77.

Finally, the argument that FERC's dismissal of Summersville's license application destroyed Summersville's valuable priority rights cannot prevail. Summersville's preliminary permit gave it a "priority of application" statutorily limited to a period not to exceed three years. *See* 16 U.S.C. § 798. It consequently had no right to have its priority maintained for a longer period.[13]

IV. CONCLUSION

FERC's dismissal of Summersville's license application as premature was consistent with past agency policy and was not arbitrary, capricious or an abuse of discretion. Accordingly, Town of Summersville's petition for review is

*Denied.*

---

**13.** The President in April of 1985 recommended that Congress *not* designate the Gauley as a wild and scenic river; this does not, however, change our conclusion. The Commission dismissed Summersville's application in May of 1984. At that time, a draft report recommended against

designation of the Gauley, but there was no prospect that the study period would end early. We cannot say that FERC abused its discretion in declining to hold Summersville's application on file in these circumstances.