30 F.3d 1519
 308 U.S.App.D.C. 152, 25 Envtl. L. Rep. 20,127
 MINE RECLAMATION CORPORATION; Kaiser Steel Resources, Inc.,
Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Eagle Mountain Energy Company, a California Corporation;
Metropolitan Water District of Southern
California, Intervenors.
 No. 93-1227.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 17, 1994.
Decided Aug. 5, 1994.
 
 Petition for Review of an Order of the Federal Energy Regulatory Commission.
 Michael C. Dotten argued the cause for petitioners. With him on the briefs was Eric R. Todderud.
 Joel M. Cockrell, Attorney, FERC, argued the cause for respondent. With him on the brief were Jerome M. Feit, Sol., Joseph S. Davies, Deputy Sol., FERC, and Samuel Soopper, Attorney, FERC.
 On the brief for intervenor Eagle Mountain Energy Company was Jose R. Allen.
 On the briefs for intervenor Metropolitan Water District of Southern California was Victor E. Gleason.
 Before EDWARDS, GINSBURG, and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge GINSBURG.
 GINSBURG, Circuit Judge:
 
 
 1
 Petitioners Mine Reclamation Corporation and Kaiser Steel seek review of an order of the Federal Energy Regulatory Commission granting Eagle Mountain Energy Company a preliminary permit for a hydroelectric project. The petitioners argue that the Commission lacked jurisdiction to issue the permit and that even if it had jurisdiction over the project, it violated various of its own regulations in granting Eagle Mountain's application. Finally, the petitioners contend that the Commission should have conducted a hearing before issuing the permit in order to resolve a disputed issue of material fact. For the reasons set out below, we deny the petition.
 
 I. BACKGROUND
 
 2
 In January 1991 Eagle Mountain applied for a preliminary permit to build a pumped storage station in Riverside County, California. The proposed project would involve pumping water from a lower to an upper reservoir during off-peak hours; the water would then be permitted to flow back from the upper to the lower reservoir during peak demand hours, thereby generating electricity for sale at the higher peak-load price. Abandoned open-pit iron ore mines would serve as the reservoirs.
 
 
 3
 The land upon which the project is to be built is owned partly by the federal government and partly by Kaiser Resources. Kaiser has leased the land it owns to Mine Reclamation Corporation (MRC), which is in the process of developing a solid waste landfill on the site. Kaiser has offered to exchange with the Bureau of Land Management certain environmentally sensitive land that it owns for some BLM land that MRC needs in order to complete the landfill project. The BLM has agreed in principle, but Eagle Mountain is trying to prevent the transfer in litigation before the Department of the Interior.
 
 
 4
 Eagle Mountain's permit application anticipated that "the water initially to charge the reservoirs and to provide makeup for seepage and evaporation losses will be obtained from the ... Colorado River Aqueduct." The Metropolitan Water District of Southern California, which owns the Colorado River Aqueduct, intervened to oppose Eagle Mountain's application. It asserted that no water is available from the Aqueduct for use in Riverside County because its contracts with the Department of Interior require that the water be used only on the Coastal Plain of Southern California.
 
 
 5
 In response Eagle Mountain clarified that it does not intend to use the Metropolitan Water District's water; rather, it stated that it was exploring the acquisition of water from other holders of Colorado River water rights, with the thought of using the excess transportation capacity of the Aqueduct to get the water to its project site. Eagle Mountain also indicated that it had explored and would continue to explore alternative sources of water. Hence, there appears to be no dispute that Eagle Mountain's application for a preliminary permit did not definitively identify the source of water for its project.
 
 
 6
 The Director of the FERC Division of Project Review granted the preliminary permit. 55 F.E.R.C. p 62,192 (1991). Kaiser and MRC sought rehearing, which the Commission denied, 62 F.E.R.C. p 61,066 (1993), and later moved to cancel the preliminary permit, which the Commission also denied, 62 F.E.R.C. p 61,163 (1993). They now petition for review in this court.
 
 II. JURISDICTION
 
 7
 Kaiser and MRC argue in various ways that the Commission did not have jurisdiction to issue, and was barred by its own rules from issuing, the preliminary permit because the applicant had not definitively identified the source of water for its proposed project. Prior to addressing those arguments, however, we consider sua sponte whether the expiration of the permit has rendered this case moot.
 
 
 8
 A. Mootness.
 
 
 9
 Eagle Mountain's preliminary permit expired on May 1, 1994. Although no party asserts that the case is therefore moot, we are obliged to address the issue sua sponte because mootness goes to the jurisdiction of this court. See Iron Arrow Honor Society v. Heckler, 464 U.S. 67, 70, 104 S.Ct. 373, 374, 78 L.Ed.2d 58 (1983) (per curiam); Moreau v. Federal Energy Regulatory Commission, 982 F.2d 556, 566 n. 4 (D.C.Cir.1993). For the present purpose, it is enough to note that the case is not moot if our decision respecting the validity of the permit would still affect the rights of the parties. See Clarke v. United States, 915 F.2d 699, 701 (D.C.Cir.1990) (en banc).
 
 
 10
 The Federal Power Act authorizes the Commission to grant a license for a hydroelectric project, see 16 U.S.C. Sec. 797(e), and in anticipation thereof to grant a preliminary permit for the purpose of allowing a potential license applicant time to collect data and to do the other things that must be done before one files a license application, see id. Sec. 797(f). The preliminary permit holder is given priority in any ensuing licensing proceeding. See 18 C.F.R. Sec. 4.80. More relevant to our mootness analysis, Sec. 24 of the Act provides:
 
 
 11
 Any lands of the United States included in any proposed project under the provisions of this subchapter shall from the date of the filing of application therefor be reserved from entry, location, or other disposal under the laws of the United States until otherwise directed by the Commission or by Congress.
 
 
 12
 16 U.S.C. Sec. 818. It is undisputed that, upon the filing of an application for a preliminary permit, included public lands are reserved pursuant to Sec. 24.
 
 
 13
 In August 1990 the BLM "segregated" certain federal lands in anticipation of transferring title to Kaiser. See 55 FED.REG. 33,178 (Aug. 14, 1990). (Segregation is "the removal for a limited period ... of a specified area of the public lands from the operation of the public lands laws," 43 C.F.R. Sec. 2200.0-6(j), thereby precluding its appropriation under those laws, see id. Sec. 2201.2(b).) On January 31, 1991, Eagle Mountain applied to the FERC for a preliminary permit to put its hydroelectric project on those same lands; it did not file an application for a hydroelectric license until April 29, 1994. Meanwhile, the BLM approved the exchange of land between Kaiser and the federal government on October 20, 1993. See 58 FED.REG. 57,617, 57,617-18 (Oct. 26, 1993).
 
 
 14
 The Bureau's approval of the land exchange is the subject of on-going litigation within the Department of the Interior. Among the issues are whether the BLM's prior segregation of the lands barred the Commission from issuing the preliminary permit (a possibility that the Commission rejected before issuing the permit), and if not, whether the Commission's grant of the preliminary permit bars the BLM from completing the land transfer. See Eagle Mountain Energy Co., No. 94-89 (IBLA Jan. 4, 1994) (staying order approving land exchange pending resolution of appeal). Were we to hold that the Commission improperly granted the preliminary permit, Eagle Mountain would no longer be able to challenge the land exchange on the basis of Sec. 24 of the Federal Power Act.
 
 
 15
 Thus will our resolution of this case affect the legal rights of the parties even though Eagle Mountain's preliminary permit has expired. Therefore the case is not moot. See British Caledonian Airways Ltd. v. Bond, 665 F.2d 1153, 1158 n. 2 (D.C.Cir.1981).
 
 B. Commission Jurisdiction
 
 16
 Under section 4(e) of the Federal Power Act, the Commission is authorized:
 
 
 17
 To issue licenses ... for the purpose of constructing, operating, and maintaining ... works necessary or convenient for ... the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce ... or upon any part of the public lands and reservations of the United States (including the Territories), or for the purpose of utilizing the surplus water ... from any Government dam....
 
 
 18
 16 U.S.C. Sec. 797(e). The petitioners argue that the FERC erred in asserting jurisdiction "solely because the project would be located in part on federal lands." If this were a correct description of the agency's holding, the petitioners would surely be correct. Cf. Chemehuevi Tribe, 420 U.S. at 412-13, 95 S.Ct. at 1076-77 (concluding that surplus water clause is not independent grant of jurisdiction to FERC). In fact, however, the Commission asserted jurisdiction over the project because it is a hydroelectric generating facility and it is to be built in part upon land owned by the United States.
 
 
 19
 As a general matter, we know "that Congress intended the Act as a whole ... to subject to regulation only that segment of the power industry involving the construction and operation of hydroelectric generating facilities." Chemehuevi Tribe of Indians v. Federal Power Commission, 420 U.S. 395, 414, 95 S.Ct. 1066, 1077, 43 L.Ed.2d 279 (1975). More specifically, a license is required only for a hydroelectric facility that satisfies one of the three conditions set out in Sec. 4 of the Act.
 
 
 20
 In granting Eagle Mountain a preliminary permit, the Commission did state that "the location of a proposed project on any part of the public lands constitutes a sufficient basis for this Commission to exercise jurisdiction over the project, regardless of the source of the project water." 62 F.E.R.C. p 61,066 at 61,322. In context, it is clear that the Commission's reference to the location of the proposed project on federal lands was meant only to say that it satisfies the second of the three disjunctive conditions of the statute.
 
 
 21
 The petitioners also object that because Eagle Mountain did not identify a source of water for its project, "it is merely speculative that the project will generate electricity from water power." Although couched in terms of the primary limitation upon the Commission's jurisdiction, i.e., to projects that generate hydroelectric power, this argument is little more than a play upon words. Any proposed project is speculative at the preliminary permit stage, in the sense that it may not be built--whether for want of water or for any other reason is of no moment. The purpose of the preliminary permit is, after all, in part to give the applicant time to determine whether the proposed project is in fact feasible. See 16 U.S.C. Sec. 797(f); 18 C.F.R. Sec. 4.80; see also Town of Summersville v. Federal Energy Regulatory Commission, 780 F.2d 1034, 1038 (D.C.Cir.1986) ("A preliminary permit is issued to enable a permittee to study an inchoate proposal that may be licensed in the future") (emphasis in original). If Eagle Mountain is ultimately unable to identify a viable source of water for its project, then it will have to abandon the project as infeasible. If the company goes ahead with the project, however, it is plainly not speculative that the project will generate electricity from water power. The Commission therefore has jurisdiction over it.
 
 
 22
 III. COMMISSION COMPLIANCE WITH ITS OWN REGULATIONS
 
 
 23
 In general, our review of a Commission decision to grant a license or a preliminary permit to a jurisdictional project is deferential and "narrowly circumscribed." See United States Department of the Interior v. Federal Energy Regulatory Commission, 952 F.2d 538, 543 (D.C.Cir.1992). "[S]o long as its decision is supported by substantial evidence in the record and reached by reasoned decisionmaking," we will deny a petition for review. Electricity Consumers Resource Council v. Federal Energy Regulatory Commission, 747 F.2d 1511, 1513 (D.C.Cir.1984) (internal quotation marks omitted). On its way to decision, however, the agency must follow its own regulations; "[i]t is a 'well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action.' " Way of Life Television Network, Inc. v. Federal Communications Commission, 593 F.2d 1356, 1359 (D.C.Cir.1979) (quoting Union of Concerned Scientists v. Atomic Energy Commission, 499 F.2d 1069, 1082 (D.C.Cir.1974)).
 
 A. Contents of the Permit Application
 
 24
 The petitioners here contend that the Commission's licensing regulations require an applicant to identify "a viable water source" for its proposed hydroelectric project, that Eagle Mountain failed to do so, and that the Commission's grant of a preliminary permit was therefore arbitrary and capricious. The FERC's regulations governing the preliminary permit process are not as specific as the petitioners imply, however. The regulations, which were obviously drafted with a conventional hydroelectric (as opposed to pumped storage) project in mind, require only that a permit applicant, as part of its statement of the "location of the proposed project," identify the "[s]tream or other body of water" involved, 18 C.F.R. Sec. 4.81(a)(2), and provide a map that shows "[t]he location of the proposed project as a whole with reference to the affected stream or other body of water." Id. Sec. 4.81(e)(1).
 
 
 25
 In the decision under review, the Commission explained how it applies these regulations to an application for a preliminary permit for a pumped storage project:
 
 
 26
 In Russell Canyon Corporation, 58 FERC p 61,288 (1992), we noted in regard to pumped storage projects that, once the reservoirs have been supplied with water, they operate essentially as a closed system. Therefore, unlike proposals involving typical hydropower projects harnessing the water power of streamflow, proposals for pumped storage projects may involve competition primarily for the reservoir sites rather than for the water resource to be developed.
 
 
 27
 62 F.E.R.C. p 61,066 at 61,321. With this understanding of the nature of a pumped storage project, the Commission concluded that the applicant "identified the project sufficiently to secure priority for the proposal" when it indicated where the necessary reservoirs would be located, identified the boundaries of the project, and stated its intention to use the Colorado River Aqueduct to transport water to the project. Id. In denying the petitioners' later motion to cancel the permit, the Commission also commented that "Eagle Mountain, by investigating the feasibility of various sources of water, is using its permit in a manner consistent with the intent of Section 5 of the FPA," 62 F.E.R.C. p 61,163 at 62,122, i.e., "for making examinations and surveys, for preparing maps, plans, specifications and estimates, and for making financial arrangements," 16 U.S.C. Sec. 798.
 
 
 28
 It is a commonplace that "[w]e must accept an agency's construction of its own regulations unless it is 'plainly wrong,' that is, 'plainly erroneous or inconsistent with the regulation.' " Hazardous Waste Treatment Council v. Reilly, 938 F.2d 1390, 1395 (D.C.Cir.1991) (quoting respectively Chemical Manufacturers Association v. Environmental Protection Agency, 919 F.2d 158, 170 (D.C.Cir.1990), and Udall v. Tallman, 380 U.S. 1, 17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). Here the Commission's regulations require the applicant only to identify the "stream or other body of water" "affected" by the project; they neither make, nor require a permit applicant to make, reference to the "source" of the water for its proposed project. The petitioners nonetheless insist that the regulation makes no sense unless the body of water affected by a pumped storage facility is interpreted to mean "the stream or waterway from which the water to supply the project will be taken." The Commission's explanation of how its rule should be applied to a proposed pumped storage project makes good sense to us, however. Unlike a conventional hydroelectric project, such a facility has no significant continuing effect upon any stream or waterway. No purpose would be served, therefore, in requiring the applicant to advise the Commission up front of the precise source of its water. That question is not of interest to the Commission because nothing turns upon the answer. Therefore, we uphold as reasonable the Commission's interpretation of its permit regulation; so interpreted there is no question of the agency's compliance with the regulation.
 
 
 29
 B. Regulation Implementing the Electric Consumers Protection Act
 
 
 30
 The petitioners also contend that because the Commission failed to require Eagle Mountain to identify the source of water for the proposed project, it frustrated the purposes of the Electric Consumers Protection Act of 1986 (ECPA), namely, to "protect, mitigate damages to, and enhance, fish and wildlife ... affected by the development, operation, and management of the project." 16 U.S.C. Sec. 803(j)(1). To these ends the ECPA requires that the FERC include in any license issued under the Federal Power Act appropriate conditions based upon recommendations received from the U.S. Fish and Wildlife Service and other agencies, both state and federal. The Commission has promulgated an implementing regulation that requires anyone who files an application for a license to consult beforehand with the relevant resource agencies, and details an exhaustive consultative process through which the applicant must go before the license can be approved.
 
 
 31
 Both the ECPA and the Commission's implementing regulations apply only to an applicant for a "license," not to an applicant for a "preliminary permit." The petitioners' challenge is therefore out of place in this proceeding.
 
 C. Issuance of Conditional Permit
 
 32
 Under the Commission's regulations, "[a]ny application, the effectiveness of which is conditioned upon the future occurrence of any event or circumstance, will be rejected." 18 C.F.R. Sec. 4.32(j). The petitioners contend that the Commission should have rejected Eagle Mountain's application because it was conditioned upon the applicant finding a source of water.
 
 
 33
 The petitioners did not raise this argument before the Commission. Our review of Commission action is limited by statute, however, to "objection[s] urged before the Commission in ... [an] application for rehearing, unless there is a reasonable ground for failure so to do." 16 U.S.C. Sec. 825l (b)). The petitioners point to no reasonable ground--in fact, they point to no ground whatsoever--for their failure to include this point in their petition for rehearing before the agency. We are therefore without jurisdiction to consider it.
 
 D. Petitioners' Request for a Hearing
 
 34
 The petitioners' final argument is that because there was a disputed issue of material fact in the agency proceeding--namely, whether Eagle Mountain has identified a source of water for its project--the Commission was required to conduct a hearing prior to granting the applicant a preliminary permit. See 18 C.F.R. Sec. 4.34(a) ("The Commission may order a trial-type hearing on an application for a preliminary permit ... upon either its own motion or the motion of any interested party of record"). Having determined that the Commission need not require a permittee definitively to identify a source of water for its proposed pumped storage project, we are hard pressed to see how the fact assertedly in dispute can still be deemed material. Moreover, even if it were material we would be loathe to require a hearing to resolve the dispute at this stage. As we noted in Town of Summersville, "[t]he Commission's policies reflect a decision to devote minimal resources to examining preliminary permit applications," primarily because "[p]ermittees often find after further investigation that no project at the site is feasible." 780 F.2d at 1039. As we also pointed out in that case, "[t]he project described in the license application often differs materially from the project described in the preliminary permit." Id. at 1038. In this circumstance, it would be wasteful for the Commission to resolve factual disputes that may well turn out to be irrelevant or, if still relevant, can be contested at the licensing stage.
 
 IV. CONCLUSION
 
 35
 Undoubtedly the petitioners are in a difficult situation insofar as the Commission's issuance of a permit to Eagle Mountain has delayed and may prevent them from getting the land they need from the Department of the Interior in order to complete their proposed landfill. That, however, is not a legal basis for obtaining relief from a reviewing court, and the petitioners have presented no other. For the foregoing reasons, therefore, we hold that the Commission properly asserted jurisdiction over Eagle Mountain's application for a preliminary permit and did not act arbitrarily or capriciously in granting that permit. The petition for review is therefore
 
 
 36
 Denied.