CITY OF ORRVILLE, OHIO and Pike Island Hydro Associates, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

No. 97–1352.

United States Court of Appeals, District of Columbia Circuit.

Argued April 10, 1998.

Decided June 30, 1998.

Carolyn Elefant argued the cause for the petitioners. Paul V. Nolan was on brief.

Larry D. Gasteiger, Attorney, Federal Energy Regulatory Commission, argued the cause for the respondents. Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor, Federal Energy Regulatory Commission, were on brief. Timm L. Abendroth, Attorney, Federal Energy Regulatory Commission, entered an appearance.

Before: SILBERMAN, HENDERSON and ROGERS, Circuit Judges.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Pike Island Hydro Associates (PIHA) formerly held the permit, and the City of Orrville formerly held the license, for a hydroelectric project at the Pike Island Locks and Dam (the Pike Island project) on the Ohio River. PIHA challenges an order issued by

the Federal Energy Regulatory Commission (FERC or Commission) that amends the license for a hydroelectric project at the New Cumberland Locks and Dam (the New Cumberland project)—a project approximately thirty miles upriver of the Pike Island project. *See City of New Martinsville, W. Virginia,* 73 F.E.R.C. ¶ 62,030 (1995) (hereinafter *Amending Order*), *aff'd on reh'g,* 78 F.E.R.C. ¶ 61,304 (1997). Orrville challenges a FERC order that denied it permission to intervene in the administrative proceeding that produced the license amendment. *See City of New Martinsville, W. Virginia,* 73 F.E.R.C. ¶ 61,241 (1995) (hereinafter *Intervention Order*), *aff'd on reh'g,* 78 F.E.R.C. ¶ 61,304 (1997). We dismiss both challenges because we conclude that (1) PIHA is not "aggrieved" by the *Amending Order,* (2) we lack jurisdiction to consider one of Orrville's claims regarding the *Intervention Order* and (3) Orrville's other claim is meritless.

## I. BACKGROUND

On September 27, 1989 the Commission issued an order authorizing the award of licenses to develop hydroelectric generating facilities at sixteen dams on rivers that collectively constitute the upper Ohio River Basin. *See Allegheny Elec. Coop.,* 48 F.E.R.C. ¶ 61,363 (1989) (hereinafter *Licensing Order*), *aff'd sub nom. United States DOI v. FERC,* 952 F.2d 538 (D.C.Cir.1992). Orrville was awarded the license to construct the Pike Island project. *See City of Orrville, Ohio,* 48 F.E.R.C. ¶ 61,359 (1989). The City of New Martinsville, West Virginia was awarded the license to build the New Cum-

berland project. *See City of New Martinsville, W. Virginia,* 48 F.E.R.C. ¶ 61,360 (1989). New Martinsville's license required it to continuously spill over, around or through the New Cumberland Locks and Dam a minimum of 4,000 cubic feet of water per second (ft$^3$/sec) from November 1 through June 30 and 15,000 ft$^3$/sec from July 1 through October 31. *See Amending Order,* 73 F.E.R.C. ¶ 62,030, at 64,037. While the mandatory spillflows decreased the amount of water available for power generation purposes, they increased the dissolved oxygen (DO) content of the water downstream of the dam, ensuring that downstream DO levels did not fall below 6.5 milligrams per liter (mg/l)—the level below which adverse environmental impacts could be expected. *See Licensing Order,* 48 F.E.R.C. ¶ 61,363, at 62,327.

On June 18, 1993 New Martinsville asked the Commission to replace the mandatory spillflows required by its license with a more dynamic alternative: real-time monitoring of downstream DO levels, accompanied by mitigative spillflows when needed to prevent levels from falling below 6.5 mg/l. While this request was pending, Orrville surrendered its license for the Pike Island project, effective October 20, 1993, citing an inability to commence construction by the deadline the license imposed. *See City of Orrville, Ohio,* 64 F.E.R.C. ¶ 62,200 (1993). Shortly thereafter, PIHA applied for and received a preliminary permit for the Pike Island project, effective date February 1, 1994.[1] *See Pike Island Hydro Assocs.,* 66 F.E.R.C. ¶ 62,065

1. A preliminary permit differs from a license in several important respects. Unlike a license, a permit does not entitle its holder to construct a hydroelectric facility. *Cf.* 16 U.S.C. § 817 (making it unlawful to construct hydroelectric project in navigable waters of United States without "license" issued pursuant to provisions of Federal Power Act). Instead, the permit merely secures the permittee's place at the front of the line of potential applicants for the project license while it gathers the data necessary to support its application. *See id.* §§ 797(f), 798; *cf. Washington Pub. Power Supply Sys. v. FPC,* 358 F.2d 840, 847 (D.C.Cir.1966) (noting that purpose of preliminary permit "is to afford protection to the entrepreneur willing to invest his time and money in determining exactly where and in what form to propose construction of a project which will be

best adapted to a comprehensive plan for improving or developing a waterway and the improvement and utilization of water power development"), *rev'd on other grounds, Udall v. FPC,* 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967); *Town of Summersville, W. Va. v. FERC,* 780 F.2d 1034, 1038 (D.C.Cir.1986) ("A preliminary permit is issued to enable a permittee to study an inchoate proposal that may be licensed in the *future.* A license application, on the other hand, is an assessment of the *present* legality and feasibility of a definite project.") (emphasis original). A preliminary permit also has a much shorter life span than a license. Whereas a preliminary permit cannot extend beyond a three-year period, *see* 16 U.S.C. § 798, a license can be effective for up to fifty years, *see id.* § 799.

(1994). The permit was issued for a period of three years, expiring "either 36 months . from the effective date or on the date that a development application which is accepted for filing is submitted by the permittee, whichever occurs first." *Id.* at 64,173.

Subsequently, the Commission allowed PIHA to intervene in the ongoing administrative proceeding regarding New Martinsville's license, and, acceding to PIHA's request, the Commission declared the commencement of a formal amendment proceeding. Consistent with 18 C.F.R. § 2.1(a)(1)(iii)(C) (1997) and the requirements of the Federal Power Act, 16 U.S.C. § 797(e), the Commission advertised the license amendment proceeding by publishing the following notice:

> Article 402 of the project license requires a continuous mitigative spillflow release of 15,000 cubic feet per second from the project during the period from July through October, to ensure maintenance of 6.5 milligrams per liter of dissolved oxygen (DO) throughout the downstream pool. The City of New Martinsville requests to substitute real-time monitoring and project operation adjustments to detect and alleviate low DO concentrations in the Ohio River downstream from the project for the continuous spillflow requirement.

Hydroelectric Applications, 60 Fed.Reg. 19,-905, 19,909 (1995). The notice was published in the April 21, 1995 edition of the *Federal Register* and the May 3, 1995 editions of two newspapers located in the vicinity of the New Cumberland project. The notice also alerted parties wishing to intervene in the proceeding and/or comment on the proposed amendment to do so by June 2, 1995. *Id.*

The Commission subsequently determined that the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* (NEPA), required preparation of an Environmental Assessment (EA) before action could be taken on New Martinsville's application for a license amendment. Thus, on July 26, 1995 the Commission issued a draft EA with a request for comments, followed by a notice in the

August 1, 1995 edition of the *Federal Register:*

> A draft environmental assessment (DEA) is available for public review. The DEA is for an application to amend the license for the New Cumberland Hydroelectric Project. The application is to reduce the spillflow requirement at the project....

Notice of Availability of Draft Environmental Assessment [Project No. 6901–026 West Virginia], 60 Fed.Reg. 39,164 (1995).

PIHA commented on both the proposed license amendment and the draft EA. In September 1995 it submitted additional comments on the draft EA, analyzing certain technical data New Martinsville had failed to provide it with earlier.[2] In a letter to the Commission dated September 13, 1995, PIHA complained about this and other lapses by New Martinsville in serving it with copies of documents and data submitted in support of the proposed license amendment. *See* Letter from Dunlevy to Secretary Cashell of 9/13/95. PIHA also noted that New Martinsville, in violation of 18 C.F.R. §§ 385.2005, 385.2010 (1997), had yet to serve PIHA with a copy of certain data submitted to the Commission and requested that the amendment proceeding be held in abeyance until PIHA was provided with a copy of, and given an opportunity to comment on, the data. *Id.*

While the document containing the data PIHA sought was placed in the public record on October 4, 1995, the Commission did not respond to PIHA's letter or mail it a copy of the document until November 16, 1995—exactly one month after the Director, Division of Project Compliance and Administration, issued an order approving amendment of New Martinsville's license consistent with the recommendations contained in the final EA. *See Amending Order,* 73 F.E.R.C. ¶ 62,030, at 64,037–71. The final EA examined three options: (1) a "no-action" alternative, leaving the spillflow requirements of the license unchanged, (2) a licensee alternative, requiring real-time monitoring of DO levels and corrective spilling whenever downstream

---

**2.** Pursuant to Commission regulations, each participant in a proceeding must serve every other participant (including intervenors) with a copy of any data or documents the participant submits to the Commission. *See* 18 C.F.R. § 385.2010(a)(1), (e)(1) (1997).

DO levels fell below 6.5 mg/l, and (3) a FERC alternative, mandating year-round spillflows of 4,000 ftwith continuous real-time monitoring of downstream DO levels and mitigative spilling whenever necessary to keep DO levels above 6.5 mg/l. *Id.* at 64,038. Because it appeared to provide the greatest assurance that downstream DO levels would not fall below 6.5 mg/l, the final EA recommended adoption of the FERC alternative. *Id.* The final EA did not consider the cumulative impact of each of the alternatives on development of the Pike Island project, noting that no license or license application for the project was then outstanding and observing that "preliminary hydropower permits do not constitute reasonably foreseeable actions and, therefore, cannot be given the same attention as license applications, amendments, or existing projects." *Id.* at 64,047–48.

Unhappy with this result, on November 15, 1995 (the day before a copy of the New Martinsville data was mailed to it) PIHA requested rehearing by the Commission, asserting five grounds for reversal of the Division Director's order. That same day, Orrville simultaneously moved to intervene and also requested rehearing.[3] In support of its intervention motion, Orrville argued that the notices of the amendment proceeding failed to apprise it (and other members of the interested public) that the amendment would adversely affect the development and operation of the Pike Island project. Further, it argued that since surrendering the license for the Pike Island project in 1993, its interest in the project had been revived, both by a fire and explosion in 1995 that damaged its sole generating facility and by proposed legislation that would allow it to seek reinstatement of its surrendered license. Nonetheless, on December 1, 1995 the Commission Secretary issued an order denying Orrville's

motion for late intervention.[4] *See Intervention Order*, 73 F.E.R.C. ¶ 61,241. Orrville promptly requested rehearing.

While both Orrville's and PIHA's rehearing requests were pending, PIHA's preliminary permit expired on January 31, 1997. Approximately six weeks later, the Commission issued an order denying both PIHA's and Orrville's rehearing requests. *See City of New Martinsville, W. Virginia*, 78 F.E.R.C. ¶ 61,304 (1997) (hereinafter *Rehearing Order*). Both PIHA and Orrville now timely petition for review of that order pursuant to section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l* (b).

## II. DISCUSSION

### A. *PIHA's Claims*

PIHA raises both procedural and substantive objections to the Commission's amendment of New Martinsville's license. As to the former, it claims that New Martinsville did not serve it with a copy of certain technical data submitted in support of the proposed amendment, as required by 18 C.F.R. § 385.2010, and PIHA was therefore "deprived of an opportunity to comment in a fully informed manner on the proposed amendment." Pet'rs Br. 26. As to its substantive objection, PIHA contends that the Commission violated section 10 of the Federal Power Act, 16 U.S.C. § 803(a), because it failed to consider the effect reduced spillflows at the New Cumberland project would have on the potential development of the Pike Island project. The Commission responds to each of PIHA's claims on the merits and also argues that the expiration of PIHA's permit extinguished its interest in the Pike Island project, depriving PIHA of standing.[5] Separation of powers principles

3. The motion to intervene was necessary because only an intervenor in, or other party to, a proceeding may seek a rehearing on the final decision. *See* 18 C.F.R. § 385.713(b) (1997).

4. The Secretary also rejected Orrville's rehearing request inasmuch as only a party to a proceeding may request rehearing. *See Intervention Order*, 73 F.E.R.C. ¶ 61,241.

5. The Commission's brief can be read to urge dismissal on either mootness or standing grounds. *See* Resp't Br. 26–27 & n.13. Because PIHA's preliminary permit expired before it petitioned for review, however, its claims are properly disposed of on standing, rather than mootness, grounds. *See SunCom Mobile & Data, Inc. v. FCC*, 87 F.3d 1386, 1389 (D.C.Cir.1996) (noting that "critical time for Article III standing analysis" is date on which petition for review is filed); *cf. Garden State Broad. Ltd. Partnership v. FCC*,

oblige us to address the Commission's standing argument first, *see Steel Co. v. Citizens for a Better Env't,* — U.S. —, —, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998), which we find dispositive.

Section 313(b) of the Federal Power Act provides that "[a]ny party to a proceeding ... aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order ... in the United States Court of Appeals for the District of Columbia." 16 U.S.C. § 825*l* (b). "The requirement of aggrievement serves to distinguish a person with a direct stake in the outcome of a litigation from a person with a mere interest in the problem." *North Carolina Utils. Comm'n v. FERC,* 653 F.2d 655, 662 (D.C.Cir.1981) (internal quotations and ellipses omitted). Nevertheless a party does not acquire such a "direct stake in a litigation" simply by participating in the antecedent administrative proceedings whence the litigation arises; it must establish its constitutional and prudential standing. *See Louisiana Energy & Power Auth. v. FERC,* 141 F.3d 364, 366 (D.C.Cir.1998) ("A party is 'aggrieved' under this statute [16 U.S.C. § 825*l*] if it satisfies both the constitutional and prudential requirements for standing."); *Chemehuevi Tribe of Indians v. FPC,* 489 F.2d 1207, 1212 n. 12 (D.C.Cir.1973) ("[T]he fact that a person is a party in agency proceedings does not require that he be allowed to seek judicial review of the agency's action; he must still satisfy judicial standing requirements."), *vacated on other grounds,* 420 U.S. 395, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975); *cf. Inner City Press v. Board of Governors of the Fed. Reserve,* 130 F.3d 1088, 1089 (D.C.Cir.1997) ("We publish this opinion to emphasize that participation in administrative proceedings before the Board of Governors of the Federal Reserve System, like such participation before any agency, ... does not, without more, satisfy a petitioner's Article III injury-in-fact requirement."); *United States v. Federal Maritime Comm'n,* 694 F.2d 793, 800 n. 25 (D.C.Cir.1982) ("Although participation in the [administrative] proceeding below may be an inflexible prerequisite to be a 'party aggrieved' ... it does not follow that participation in and of itself provides a springboard for judicial review, for the party still must meet judicial standing requirements.").

To establish its Article III standing, a party must demonstrate the following:

(1) that [it has] suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there [was] a causal connection between the injury and the conduct complained of—the injury [was] fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997). "[W]hen the [party] is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Charitably construed, PIHA's submissions suggest that two of its interests have been adversely affected by the amended New Cumberland project license: (1) PIHA's "procedural right" to comment on certain documents submitted in support of the license amendment; (2) PIHA's interest in development of the Pike Island project.[6] With respect to PIHA's asserted procedural right, however, the alleged infraction of 18 C.F.R. § 385.2010(e) is not alone sufficient to establish injury in fact. *See Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 664–65

---

996 F.2d 386, 394 (D.C.Cir.1993) ("[B]ecause Garden State appealed before the FCC disqualified its license application, we uphold the Commission on the ground of mootness rather than standing."). Nonetheless, mootness cases may be instructive insofar as "[m]ootness and standing are related concepts." *Garden State Broad.,* 996 F.2d at 394.

**6.** In assessing PIHA's standing, we note at the outset that we are hindered by PIHA's failure to address the matter in its briefs.

(D.C.Cir.1996) ("The mere violation of a procedural requirement thus does not permit any and all persons to sue to enforce the requirements."). Instead, "[a] party who would complain that agency action has violated the Constitution, a statute, or a regulation, must be adversely affected by that action." *Capital Legal Found. v. Commodity Credit Corp.*, 711 F.2d 253, 258 (D.C.Cir. 1983). Thus, "[i]njury in fact, caused by the *substance* of an agency action or inaction, is an essential element" of a petitioner's standing. *Id.* (emphasis added); *accord Defenders of Wildlife*, 504 U.S. at 573 n. 8, 112 S.Ct. 2130 ("We do not hold that an individual cannot enforce procedural rights; he assuredly can, so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing."); *Wilderness Soc'y v. Griles*, 824 F.2d 4, 19 (D.C.Cir.1987) ("Since plaintiffs lack standing to challenge [the agency's] substantive actions, they indeed lack standing to challenge procedural defects in the process that produced those actions."); *California Ass'n of Physically Handicapped, Inc. v. FCC*, 778 F.2d 823, 827 n. 14 (D.C.Cir.1985) ("[Petitioner] must allege an underlying substantive stake in the result of the decision in order to assert standing based on a procedural default.").

■ PIHA'S substantive interest is in the development and operation of the Pike Island project. Yet, we conclude that this interest is too attenuated, and therefore its injury too speculative, to satisfy the requirements of Article III.[7] We find support for our conclusion in two cases that considered challenges to licensing decisions of the Federal Communications Commission (FCC). First, in *Free Air Corp. v. FCC*, 130 F.3d 447 (D.C.Cir. 1997), we held that a disappointed applicant for an FM radio broadcast license did not possess Article III standing to challenge the FCC's award of that license to another party. In so doing, we observed that, although "the grant of a broadcasting license forecloses later opportunities to compete in a possible new licensing proceeding[,] ... such a foreclosure is too speculative an injury for Article III standing." *Id.* at 449. Second, in *SunCom Mobile & Data, Inc. v. FCC*, 87 F.3d 1386 (D.C.Cir.1996), we held that a *prospective* applicant for a 220 MHz transmission network license lacked Article III standing to challenge the FCC's (1) denial of its request for a declaration that its envisioned network qualified for a regulatory exemption from the FCC rule proscribing ownership of multiple 220 MHz licenses for service in a single 40–mile area and (2) denial of its request for a waiver of the customary eight-month construction deadline:

> SunCom alleged no actual, existing interest in the licenses for which it made the two requests nor even a contract to acquire such but only an intent to purchase

7. Indeed, even before the January 31, 1997 expiration of PIHA's permit, the Congress enacted the following legislation, casting at least some doubt on PIHA's status as a preferred applicant for the Pike Island project license:

> Notwithstanding the expiration of the license and notwithstanding the time period specified in section 13 of the Federal Power Act (16 U.S.C. 806) that would otherwise apply to the Federal Energy Regulatory Commission Project No. 3218 [the Pike Island project], the Commission shall, at the request of the licensee for the project [Orrville], reinstate the license effective September 25, 1993, and extend the time period during which the licensee is required to commence the construction of the project so as to terminate on September 24, 1999.

Act of Oct. 9, 1996, Pub.L. No. 104–257, 110 Stat. 3171. While Orrville conceded at oral argument that it has not yet exercised its rights under this provision, and while there is some question whether the provision could be read to displace PIHA from its preferred position without further agency action, *cf. Northern Colorado Water Conservancy Dist. v. FERC*, 730 F.2d 1509, 1512 (D.C.Cir.1984) ("But in spite of the [statutory] preference for public ownership, once a permit is issued, whoever has the permit has priority at the licensing stage over all competitors, be they public or private."), the provision would at least appear to have provided the Commission a ground to cancel PIHA's permit. *See* 18 C.F.R. § 4.83 (1997) ("The Commission may also cancel a permit for other good cause shown after notice and an opportunity for hearing."). Moreover, Commission precedent suggests that it would refrain from issuing PIHA a license for the project in advance of September 24, 1999. *See City of Santa Clara, California*, 19 F.E.R.C. ¶ 62,323 (1982) (in proceeding to issue preliminary permit, Commission noted that if the Congress subsequently acted to foreclose development by permittee, it would thereafter simply deny application submitted by permittee).

unidentified licenses sometime in the future, after FCC approval and station construction. Based on the allegations before the Commission, we see no likelihood that SunCom stood to suffer the kind of concrete, probable harm from the Commission's denials that Article III requires.

*Id.* at 1388.[8]

Like the prospective applicant in *SunCom*, PIHA does not possess a license for the Pike Island project and has not applied for such a license. Moreover, like the disappointed applicant in *Free Air*, PIHA may not be eligible to secure the Pike Island license, *see supra* note 8, and even if it were, success on its claim here would not result in the reinstatement of its preliminary permit and would not increase the likelihood that it will ultimately be licensed to build and operate the Pike Island project.[9] In other words, even if PIHA applies for the Pike Island project license in the future, at that point its rights will be identical to those of any other applicant. Therefore, any adverse effect New Martinsville's amended license may have on PIHA's interest in the Pike Island project is too speculative, generalized and remote to satisfy the requirements of Article III.[10] *See Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, 962 F.2d 27, 35 (D.C.Cir.1992) ("Allegations of injury based on predictions regarding future legal proceedings are ... too speculative to invoke the jurisdiction of an Article III Court.... Because [petitioner] has demonstrated no current or even impending injury, we agree

... that [petitioner] lacks standing to petition for review of the Commission's order.") (internal quotations and brackets omitted).

### B. Orrville's Claims

Orrville contends that, in rejecting its late intervention motion, the Commission erred in two respects: (1) rather than assess Orrville's motion according to the five factors set forth in 18 C.F.R. § 385.214(d)(1) (1997), the Commission applied an "extraordinary circumstances" test; (2) even if applicable, the Commission misapplied the "extraordinary circumstances" test because it failed adequately to consider the actual (as opposed to presumed) prejudice to the parties, the burden on the Commission and the delay and disruption that would have resulted from allowing Orrville to intervene. The Commission responds that the "extraordinary circumstances" test applies and that it fully considered all of the factors required by that test. A brief discussion of the pertinent regulations sets the stage.

### (1) Regulatory Context

Pursuant to the Commission's regulations, an entity must file with the Commission a motion to intervene in any proceeding in which it seeks to become a party. *See* 18 C.F.R. § 385.214(a)(3) (1997). The public notice that advertises the commencement of a proceeding also establishes the date by which a motion to intervene must be filed. *See id.*

8. In certain circumstances, we have held that a disappointed license applicant may have standing to challenge the license awarded. *See, e.g., Orange Park Florida T.V., Inc. v. FCC*, 811 F.2d 664 (D.C.Cir.1987) (allowing competitor for license to challenge FCC approval of amendment of another competitor's license application and award because, in absence of alleged FCC error in approving amendment, petitioner might have remedied deficiencies in its own application and reapplied for license). We have also found that a disappointed bidder may have standing to challenge a contract award. *See, e.g., National Fed'n of Fed. Employees v. Cheney*, 883 F.2d 1038, 1052–54 (D.C.Cir.1989) (allowing disappointed bidder to challenge award on ground agency errors resulted in award to successful bidder rather than disappointed bidder), *cert. denied*, 496 U.S. 936, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990). Those cases are inapposite here, however, because, even were we to set aside the license

amendment, it would not make *PIHA's* interest in the Pike Island project any less speculative and it would not improve *PIHA's* opportunity to apply for the Pike Island project license in the future.

9. Even if PIHA still had a valid preliminary permit for the Pike Island project, it is far from apparent that this interest alone would be sufficiently concrete to meet the injury-in-fact test of Article III. *Cf. Town of Summersville*, 780 F.2d at 1038–39 ("The preliminary permit is actually only a minor threshold hurdle for the applicant, and the grant of a preliminary permit is in no respect an indication of the merits of a license proposal.").

10. Because PIHA has failed to meet Article III standing requirements, we need not address its prudential standing. *See Free Air Corp.*, 130 F.3d at 448 n. 1.

§ 385.210(b). Even after that deadline has passed, however, an entity may submit a motion for "late intervention." *Id.* § 385.214(b)(3). In that instance, the motion must contain, in addition to the materials and representations required to support a timely intervention motion, a showing of "good cause why the time limitation should be waived." *Id.*

Although necessary, a showing of "good cause" may not alone be sufficient to grant a late intervention motion. Rather, the Commission "may consider" not only "whether . . . (i) The movant had good cause for failing to file the motion within the time prescribed," but also whether:

> (ii) Any disruption of the proceeding might result from permitting intervention;

> (iii) The movant's interest is not adequately represented by other parties in the proceeding;

> (iv) Any prejudice to, or additional burdens upon, the existing parties might result from permitting the intervention; and

> (v) The motion conforms to the requirements of paragraph (b) of this section.

*Id.* § 385.214(d)(1). *Cf. Covelo Indian Community v. FERC*, 895 F.2d 581, 586 (9th Cir.1990) ("Under FERC's regulations, 'good cause' for failing to file a timely motion to intervene was only one of [several] factors to be weighed when considering whether late intervention should be allowed.").

■ Further, when a late intervention motion is filed after the proceeding to which the motion is addressed has produced a final decision, the Commission has repeatedly stated that it will act favorably on the motion only in extraordinary circumstances:

> When late intervention is sought after issuance of an order disposing of an application . . . the prejudice to other parties and burden upon the Commission of granting late intervention are substantial. In such a situation, . . . extraordinary grounds must be presented to warrant favorable action on a request for late intervention.

*Weber Basin Water Conservancy Dist.*, 50 F.E.R.C. ¶ 61,409, at 62,262 (1990) (footnotes omitted); *accord City of Seattle, Washington*, 72 F.E.R.C. ¶ 61,023 (1995) (similar), *aff'd on reh'g*, 75 F.E.R.C. ¶ 61,319 (1996); *Albert Rim Hydroelectric Assocs.*, 65 F.E.R.C. ¶ 61,187 (1993) (similar); *Central Vermont Pub. Serv. Corp.*, 53 F.E.R.C. ¶ 61,-204 (1990) (similar); *Adirondack Hydro Dev. Corp.*, 46 F.E.R.C. ¶ 61,312 (1989) (similar); *Hy-Tech Co.*, 29 F.E.R.C. ¶ 61,130 (1984) (similar).[11]

Here, the Commission Secretary denied Orrville's motion because she found that Orrville did not present any "extraordinary grounds to justify favorable action by the

---

**11.** While, for the reasons set forth below, we lack jurisdiction to decide Orrville's first claim, we note in passing that its suggestion—that logically, the "extraordinary circumstances" test renders meaningless the "good cause" showing required by 18 C.F.R. § 385.214(b)(3) and (d)(1)(i), *see* Pet'rs Reply Br. 2 n.1—is simply wrong. By its own terms, the "extraordinary circumstances" test applies only to a *post-decisional* intervention motion. *Cf. NorAm Gas Transmission Co.*, 83 F.E.R.C. ¶ 61,142 (1998) (finding "good cause" to permit late intervention where motion filed one day after deadline but before decision rendered). In addition, to the extent Orrville means to suggest by its argument that the Commission could not supplement or refine the test set forth in its regulations by adjudication, it is plainly mistaken. *See* Pet'rs Reply Br. 2–3. An agency's choice of which regulatory vehicle (rulemaking or adjudication) is the more appropriate means to refine a standard "lies primarily in the informed discretion of the administrative agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *accord NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974) ("[T]he choice between rulemaking and adjudication lies in the first instance with the [agency]'s discretion."); *Lineas Aereas del Caribe v. DOT*, 791 F.2d 972, 978 (D.C.Cir.1986) (rejecting petitioner's "inexplicabl[e]" argument that FAA could not promulgate contested rule by adjudication rather than rulemaking; "[T]he FAA flies by the book when it develops and applies a policy in an adjudicatory proceeding and announces that it will also apply the policy prospectively.").

Orrville also suggests that *Wolverine Power Co.*, 43 F.E.R.C. ¶ 61,514, at 61,971–72 (1988), supports application of the "good cause" standard set forth in 18 C.F.R. § 385.214(d)(1) to a late intervention motion. It is mistaken. First, as the Commission notes, its *Weber Basin* decision post-dates *Wolverine Power* and constitutes the controlling test. Further, *Wolverine Power* is distinguishable because the Commission's grant of the contested motion for late intervention in that case would not have significantly prejudiced the other parties nor burdened the Commission.

Commission." *City of New Martinsville, W. Virginia,* 73 F.E.R.C. ¶ 61,241 (1995) (footnote omitted). On rehearing, the Commission agreed:

> When late intervention is sought after the issuance of an order disposing of an application, as is the case here, the entity seeking intervention must demonstrate extraordinary circumstances to justify favorable action by the Commission. The Secretary denied [Orrville's] motion[ ] for late intervention, concluding that [it] had failed to demonstrate such extraordinary circumstances.
>
> On rehearing, [Orrville] reiterate[s][its] contention that the public notices of the [proceeding] and the draft of the EA did not adequately describe the amendment proposal. We do not agree. The purpose of the notice is to alert the public to the general nature of the proposed action; it does not identify all potential issues that may arise in the proceeding. Nor does the notice of the environmental document do that. If more detailed information is needed for an entity to determine whether, or to what extent, it may be affected by the proposal, it is the entity's responsibility to seek out that information.
>
> The notices sufficiently alerted the public that New Martinsville wanted to amend the spillflow requirements of its license. The notice of the availability of the draft EA, issued July 25, 1995, well before the issuance of the Division Director's order, provided additional information on the amendment proposal.... The burden is on [Orrville] to act affirmatively to protect [its] interests. [Its] failure to do so in this proceeding until after the Division Director issued his order is

not an extraordinary circumstance warranting such late intervention. We therefore affirm the Secretary's denial of late intervention and the resulting rejection of [Orrville's] rehearing request[ ]. In any event, [Orrville's] arguments on the merits of the license amendment are similar to those raised by Pike Island Hydro, which we address next..

*Rehearing Order,* 78 F.E.R.C. ¶ 61,304, at 62,309 (footnotes omitted). In a footnote, the Commission also rejected Orrville's contention that the notices of the amendment proceeding should have been published in newspapers circulated in the vicinity of the City of Orrville, Ohio, observing that the notice was distributed as required by the Federal Power Act and that it was also published in the *Federal Register. See id.* at 62,309 n. 14.

### (2) Applicability of Extraordinary Circumstances Test

Orrville contends that the Commission erred by requiring a showing of "extraordinary circumstances" instead of adhering to the "good cause" standard set forth in the Commission's regulations, i.e., 18 C.F.R. § 385.214(d)(1)(i). While the Commission has not challenged our jurisdiction to decide Orrville's claim, we must nonetheless be certain of it before proceeding to the merits. *See Liquid Carbonic Indus. Corp. v. FERC,* 29 F.3d 697, 701 (D.C.Cir.1994) (noting court's independent obligation to assure itself of petitioner's standing even if respondent does not challenge it); *Steel Co.,* — U.S. at ——, 118 S.Ct. at 1012.

While Orrville is an "aggrieved party" with respect to the Commission's denial of its late intervention motion,[12] its claim

---

12. Unlike PIHA, Orrville has standing to challenge the denial of its late intervention motion. *See Northern Colo. Water Conservancy Dist. v. FERC,* 730 F.2d 1509, 1515 (D.C.Cir.1984) ("It would be grossly unfair to deny judicial review to a petitioner objecting to an agency's refusal to grant party status on the basis that the petitioner lacks party status. Such a petitioner must obviously be considered a party for the limited purpose of reviewing the agency's basis for denying party status."). Orrville does not have standing to challenge the merits of the Commission's decision to amend New Martinsville's license, however, because it was not a "party" to the proceed-

ing. *See Water Transp. Ass'n v. ICC,* 819 F.2d 1189, 1192 (D.C.Cir.1987) ("When intervention in agency adjudication or rulemaking is prerequisite to participation therein, standing to seek judicial review *of the outcome* will be denied to those who did not seek—or who sought but were denied—leave to intervene.") (emphasis added); *id.* at 1192 n. 28 ("Standing to challenge a denial of intervention, however, rests on a different footing. In [*S.C. Loveland Co., Inc. v. United States,* 534 F.2d 958, 960 n. 1 (D.C.Cir.1976)], we refused 'party aggrieved' status to one whose petition to intervene was denied by the commission, *id.,* but because we found the denial im-

as to the inapplicability of the "extraordinary circumstances" test founders on another jurisdictional shoal. Section 313(b) of the Federal Power Act recites, in relevant part, that "[n]o· objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." [13]  16 U.S.C. § 825*l* (b). We have thus held that "[p]arties seeking review of FERC orders must petition for rehearing of those orders and must *themselves* raise in that petition *all* of the objections urged on appeal." *Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC,* 876 F.2d 109, 113 (D.C.Cir. 1989) (emphasis original). These statutory requirements "are strict and go well beyond judicially-imposed standards requiring the exhaustion of administrative remedies prior to the exercise of federal court jurisdiction." *Id.* at 112–13. As a result, we have held that "[n]either FERC nor this court has authority to waive these statutory requirements." *Id.* at 113; *accord Kelley v. FERC,* 96 F.3d 1482, 1487 (D.C.Cir.1996) ("We have emphasized repeatedly that we must construe strictly this express statutory limitation on the jurisdiction of the courts.") (internal quotations and brackets omitted).

■ After scouring Orrville's rehearing request, we find in it no suggestion that the Commission Secretary erred in applying an "extraordinary circumstances" test to Orrville's late intervention motion.[14]  Indeed, most of the argument in the rehearing petition assumes that *Weber Basin* not only applies but controls. *See, e.g.,* Request of the

City of Orrville and the Village of Yorkville for Reh'g of Notice Den. Interventions and Rejecting Reqs. for Reh'g, 25 ("Moreover, the circumstances that exist in this case when applied to *Weber* and other similar instances provide more than adequate justification for the Commission to grant the Ohio Municipalities interventions."). Thus, in its rehearing petition Orrville argued that its late intervention motion should be granted *according* to the "extraordinary circumstances" test set forth in *Weber Basin,* whereas Orrville now argues that its motion should have been granted *despite Weber Basin* and the "extraordinary circumstances" test. *See* Pet'rs Reply Br. 2–3 ("[T]he Commission's 'extraordinary circumstances' test … as developed in *Weber Basin* violates its own rules governing late intervention and represents an abuse of discretion."). Accordingly, because it was not raised in its rehearing petition, we are without jurisdiction to consider Orrville's claim as to the inapplicability of the "extraordinary circumstances" test. *Cf. Kelley,* 96 F.3d at 1488 ("Suffice it to say that an argument 'implicit' in prior requests before the Commission's staff does not satisfy the strict standard of § 313(b).").

### (3) Commission's Application of Extraordinary Circumstances Test

■ Having disposed of all of the petitioners' claims, save one, on jurisdictional grounds, we now consider the only remaining question; whether the Commission properly applied the "extraordinary circumstances" test here.[15]  To succeed on this claim, Orr-

---

proper, we remanded with directions to allow the intervention. *Id.*"). Moreover, because Orrville's standing extends only to its intervention claims, which are entirely separate from PIHA's claims on the merits, PIHA cannot piggyback on Orrville's standing. · *Cf. Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1232 (D.C.Cir.1996) ("For *each* claim, if constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise *that* claim.") (emphasis added).

13. Orrville has not suggested, and we cannot ourselves conceive of, any "reasonable ground" for its failure to present its arguments to the Commission and thus the statutory exception to

exhaustion recognized in section 313(b) is unavailable. *Cf. Platte River Whooping Crane,* 962 F.2d at 35 n. 3 (declining to search for grounds on which to apply statutory exception where "[n]o one argues that the exception applies here").

14. Our review of Orrville's rehearing petition has been hampered by the fact that Orrville has reproduced in the Joint Appendix only the odd-numbered pages of· its petition for rehearing. We assume that were we to review the even-numbered pages, the result would be the same.

15. While the matter is not free from all doubt, Orrville arguably raised this claim in its rehearing petition, thereby satisfying the requirements

ville must show that the Commission abused its discretion. *See Covelo Indian Community*, 895 F.2d at 587 (9th Cir.1990); *cf. S.C. Loveland Co.*, 534 F.2d at 960 n. 1 (remanding matter to agency after finding ICC abused its discretion in denying party right to intervene in administrative proceedings); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (in considering whether agency abused its discretion, "court must consider whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment"). We will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

The "extraordinary circumstances" test, as the Commission reasonably construes it, is a refinement of the five-factor test set forth in 18 C.F.R. § 385.214(d)(1). *Cf. Amerada Hess Pipeline Corp. v. FERC*, 117 F.3d 596, 600 (D.C.Cir.1997) (court defers to reasonable agency interpretation of its own regulations). The Commission has determined that the prejudice to other parties and the burden on the Commission—relevant considerations pursuant to 18 § 385.214(d)(1)(iv) (1997)—are likely to be "substantial" whenever a postdecisional late intervention motion is granted. *Cf. Central Vermont*, 53 F.E.R.C. ¶ 61,204, at 61,817–18 ("The potential for prejudice to the other parties, and the burden on the Commission, are substantial when late intervention is sought after issuance of an order disposing of a proceeding."). Moreover, while the Commission has indicated a willingness to consider the other factors set forth in

18 C.F.R. § 385.214(d)(1) before acting on a post-decisional late intervention motion, it has nowhere suggested that it must consider each of these factors where a party fails to satisfy the threshold requirement of "extraordinary circumstances" for its delay. Indeed, even the text of 18 C.F.R. § 385.214(d)(1) does not compel consideration of each of the factors; it merely states that the Commission "may consider" them. Nor is the Commission obligated to make independent findings on each of the factors set forth in its regulation. *Cf. Citizens to Preserve Overton Park*, 401 U.S. at 417, 91 S.Ct. 814 (formal findings on each of several factors not normally required in absence of statute or regulation requiring findings).

■ As a result, we find no abuse of discretion in the Commission's denial of Orrville's intervention motion. The Commission considered and found unpersuasive Orrville's explanation for its failure to move timely for intervention and we find no "clear error of judgment," *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814, in the Commission's determination that Orrville failed to demonstrate "extraordinary circumstances" for its tardiness. The Commission also concluded that Orrville's arguments were "similar" to those advanced by PIHA.[16] Further, in applying the "extraordinary circumstances" test, the Commission presumed that the prejudice to New Martinsville and burden on it would be substantial were it to permit Orrville to intervene at such a late date. Each of these findings reflects consideration of one of the factors set forth in 18 C.F.R. § 385.214(d)(1) and none weighed in favor of granting Orrville's application. No more was required of the Commission. Thus, while Orrville asserts that no disrup-

of section 313(b) of the Federal Power Act and establishing our jurisdiction to decide the question. *See* Request of the City of Orrville and the Village of Yorkville for Reh'g of Notice Den. Interventions and Rejecting Reqs. for Reh'g, 31–35 (subheading entitled, "GRANTING THE INSTANT INTERVENTIONS WILL CAUSE NO DISRUPTIONS, DELAY, BROADENING OF THE ISSUES, OR PREJUDICE").

**16.** The similarity in Orrville's arguments and PIHA's arguments is apparent from their rehearing requests. *Compare* City of Orrville's Mot. to Intervene and Reh'g Req., 6–7 ("The elimination

of a ... hydroelectric project at the Pike Island [Locks and Dam] ... is an extreme form of mitigation that clearly is not best adapted to the comprehensive development of the Ohio River."), *with* Request of Pike Island Hydro Assocs. for Reh'g of Order Am. New Cumberland Spill Flow Requirement, 39 ("THE UTILIZATION OF THE WATER RESOURCES AT THE PIKE ISLAND L[OCKS] & D[AM] IN THE OPERATION OF THE NEW CUMBERLAND PROJECT IS NOT BEST ADAPT [sic] TO THE COMPREHENSIVE DEVELOPMENT OF THE OHIO RIVER.").

tion or prejudice would have resulted from its intervention and that its interests were "paramount" and inadequately represented by other parties, the Commission was not required to accept or respond to these self-serving assertions, especially in light of Orrville's failure to make the requisite threshold showing of "extraordinary circumstances." *Cf. Frizelle v. Slater,* 111 F.3d 172, 176 (D.C.Cir.1997) ("While the Board [of Correction of Military Records] could have explained its reasons for rejecting Frizelle's arguments in more detail, an agency decision need not be a model of analytic precision to survive a challenge. A reviewing court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (internal quotations and bracket omitted).

## III. CONCLUSION

For the preceding reasons, we hold that PIHA is not "aggrieved" by amendment of New Martinsville's license, that Orrville failed to preserve its claim respecting the applicability of the "extraordinary circumstances" test and that Orrville failed to demonstrate that the Commission abused its discretion in assessing the merits of its untimely intervention motion. Accordingly, PIHA's and Orrville's joint petition is dismissed with respect to all jurisdictionally defective claims and is denied with respect to Orrville's claim that the Commission abused its discretion in failing to find that "extraordinary circumstances" warranted granting Orrville's late intervention motion.

*So ordered.*