STATE OF WISCONSIN, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

No. 98–3312.

United States Court of Appeals, Seventh Circuit.

Argued May 10, 1999.

Decided Sept. 16, 1999.

Philip Peterson (argued), Office of the Attorney General, Wisconsin Dept. of Justice, Madison, WI, for Petitioner.

Jay L. Witkin, Monique Penn–Jenkins (argued), Federal Energy Regulatory Commission, Washington, DC, for Respondent.

Before BAUER, KANNE, and EVANS, Circuit Judges.

BAUER, Circuit Judge.

On February 5, 1997, the Federal Energy Regulatory Commission (the "FERC") issued licenses for six hydropower projects on the Flambeau River in Wisconsin. These six project licenses were divided between two companies, Fraser Papers, Inc. ("Fraser") and Northern States Power Co. ("Northern States"). Wisconsin appeals from the FERC's orders granting these six project licenses, arguing that each license should contain an article requiring a fish entrainment protection device study. Because we find that Wisconsin does not have Article III standing to assert its claim before this Court, we dismiss the petition for review.

## I. BACKGROUND

### A. The FERC

Under § 4(e) of the Federal Power Act (the "FPA"), 16 U.S.C. § 797(e), the FERC may license hydroelectric power projects on waterways subject to Congressional regulation under the Commerce Clause. The FERC may license hydroelectric projects that are "best adapted to a comprehensive plan ... for the improvement and utilization of water-power development, for the adequate protection, mitigation, and enhancement of fish and wildlife ..., and for other beneficial public uses." FPA § 10(a), 16 U.S.C. § 803(a). In making its public interest determinations under the FPA, the FERC must give equal consideration to the "power and development purposes" of a hydroelectric project and to the "protection, mitigation of damages to, and enhance-

ment of fish and wildlife," and "the preservation of other aspects of environmental quality." FPA § 4(e), 16 U.S.C. § 797(e). When granting a hydroelectric power project license, the FERC is to consider the recommendations of state and federal agencies exercising administration over, *inter alia*, "relevant resources of the State in which the project is located." FPA § 10(a)(2)(B), 16 U.S.C. § 803(a)(2)(B).

### B. Projects in the Flambeau River

The Flambeau River, a tributary of the Chippewa River, is located in north central Wisconsin. Within the 1,860 square-mile Flambeau River Basin are two storage reservoir complexes and eight existing hydroelectric projects, six of which are at issue in this proceeding. Fraser owns the licenses on four of the six projects and Northern States owns the licenses on the remaining two.

### C. The Project Licenses

In 1991, Fraser and Northern States applied to the FERC for licenses for these six projects. As part of the licensing process required under 18 C.F.R. § 16.8, both Fraser and Northern States consulted with various state conservation and resource agencies, such as the Wisconsin Department of Natural Resources (the "WDNR"). Fraser and Northern States also conducted a year-long fish entrainment[1] study in five of the six project sites.

In 1993, the FERC issued a public notice for each license application. The WDNR filed preliminary comments and recommendations with the FERC on the projects, stating that Fraser's and Northern States' assessments of fish entrainment were deficient because: (1) the assessments underestimated fish mortality; and (2) the WDNR fish sampling methodology should have been used in formulat-

---

1. Fish "entrainment" is the process whereby fish are pulled in and drawn through the hydropower project's turbines. Not surpris-

ingly, this process can wound or even kill the fish.

ing the assessments. The WDNR also recommended to the FERC that Fraser and Northern States develop fishery management plans and consult with it on all fishery management practices, including fish entrainment.

On December 8, 1995, the FERC published a draft Environmental Impact Study (the "draft EIS") for the six projects. The draft EIS evaluated the fish studies that were conducted at the five hydroelectric projects. These studies included data provided by Fraser and Northern States on the number and type of fish entrained at the project sites in a one-year period. The data also estimated the incidence of fish mortality in the turbines. After compiling the data, the FERC's staff estimated that, for the five projects studied, a total of 337,000 fish had been entrained annually and that between 12,000 and 58,000 fish were killed annually. The data revealed that the majority of fish killed generally were less than one year old. These figures were set forth in the draft EIS.

In the draft EIS, the FERC noted that "although the impact of fish entrainment and associated turbine mortality to the fishery of the Flambeau is probably minimal, without detailed long-term information on fish population dynamics within the Flambeau River, it is difficult to determine the effects of entrainment and associated turbine mortality on fish populations." In the draft EIS, the FERC also evaluated the costs associated with installing and maintaining at the project sites fish barrier nets and other protective devices designed to discourage fish entrainment. The FERC concluded in the draft EIS that installation of fish protection devices would not be appropriate "based on the lack of a fishery management plan for the Flambeau River, the extent of entrainment losses that are occurring, and the estimated cost of the protection measures." Nevertheless, the FERC recommended in the draft EIS that Fraser and Northern States evaluate, in consultation with the WDNR, alternative fish protection devices or compensatory measures at the six projects.

On September 30, 1996, the FERC issued its final Environmental Impact Study (the "final EIS"). In the final EIS, the FERC considered, but ultimately rejected the WDNR's data and recommendations regarding fish entrainment and mortality at the six projects. On the other hand, in the final EIS, the FERC accepted Fraser's and Northern States' entrainment and mortality data and provided reasons why their data "reasonably and accurately" estimated entrainment and fish mortality at the five projects studied. In its conclusion in the final EIS, the FERC stated:

[T]he specific effects of entrainment and turbine mortality on the impoundment fish populations are unknown. The state of fishery in the Flambeau River is dependent on a multitude of factors including water quality, climatic conditions such as precipitation and temperature, habitat conditions, and population and community interactions in addition to the effects of entrainment and turbine mortality. It is important to realize that the status of fishery in the Flambeau River has improved over the years, in spite of continuous entrainment and turbine mortality, primarily due to water quality improvements as a result of decreases in pollution discharges. However, we believe that decreasing the rate of entrainment and turbine mortality in the Flambeau River could result in subtle changes in the density and growth of walleye in the Flambeau River.

Although we conclude that the impact of entrainment and associated turbine mortality to the fishery of the Flambeau River is probably minimal, without detailed long-term information on fish population dynamics within the Flambeau River, it is difficult to determine the effects of entrainment and associated turbine mortality on fish populations in the Flambeau River.

(Final EIS, at 5–69). In the final EIS, the FERC also recommended that Fraser and Northern States evaluate, in consultation with the WDNR, alternative fish protection devices or compensatory measures at the projects.

On February 5, 1997, the FERC issued licenses to Fraser and Northern States for the six projects. In each license, the FERC incorporated several articles aimed at protecting the local fishery resources. For example, each license included a standard "reopener" article, under which the FERC reserved the right to impose additional future requirements if they became necessary. The license included a requirement for a fish entrainment study. It also included an article that memorialized Fraser's and Northern States' agreements to consult with the WDNR in implementing reasonable fishery management practices mutually agreed upon by them and the WDNR.

Immediately thereafter, Fraser and Northern States separately filed petitions challenging the FERC's licensing orders to the extent those orders included the requirement for a fish entrainment evaluation study. Specifically, both licensees contended that an entrainment evaluation study would be unduly burdensome and was not supported by the record. Citing *City of New Martinsville, West Virginia v. FERC*, 102 F.3d 567 (D.C.Cir.1996), Northern States argued that the FERC could not impose compensatory mitigation requirements for adverse impacts on fish populations absent evidence of adverse impacts.

On May 4, 1998, the FERC issued its Rehearing Order on the original licensing orders. In the Rehearing Order, the FERC agreed that the entrainment-related license requirements were not warranted for any of the six projects because the final EIS had concluded that there appeared to be "minimal or no project-caused adverse impacts on fish populations that need to be mitigated." Accordingly, the FERC deleted from the licenses the article requiring an evaluation of other entrainment protection devices or a fisheries enhancement plan. However, in the Rehearing Order, the FERC noted that should evidence of entrainment-induced adverse impacts to fish populations in the Flambeau River come to light during the term of the licenses, it may revisit the issue by exercise of its reserved authority.

The WDNR sought a reconsideration of the Rehearing Order, asserting that the FERC erred by deleting the fish entrainment articles from the six licenses. On July 17, 1998, the FERC issued its Reconsideration Order, which concluded that the WDNR had provided no new information that would cause it to revisit the final EIS conclusion. Accordingly, the FERC affirmed the May 4, 1998 Rehearing Order's deletion of the fish entrainment articles on the six projects. This petition for review followed.

On appeal, Wisconsin contends that the FERC erred as a matter of law in deleting the entrainment articles from the six Flambeau River projects.

## II. DISCUSSION

■ The FERC sets forth a threshold objection to Wisconsin's petition, asserting that under § 313(b) of the FPA, Wisconsin is not a party "aggrieved" by the FERC's order and hence not entitled to petition for judicial review. 16 U.S.C. § 825*l*(b). Specifically, the FERC argues that its decision to delete the fish entrainment article from Fraser's and Northern States' project licenses does not make Wisconsin an "aggrieved" party and, therefore, Wisconsin does not have standing to bring this lawsuit.

■ Section 313(b) of the FPA provides that "[a]ny party to a proceeding ... aggrieved by an order issued by the [FERC] in such proceeding may obtain a review of such order ... in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place

of business." 16 U.S.C. § 825l(b). "The requirement of aggrievement serves to distinguish a person with a direct stake in the outcome of a litigation from a person with a mere interest in the problem." *City of Orrville, Ohio v. FERC*, 147 F.3d 979, 985 (D.C.Cir.1998) (quoting *North Carolina Utils. Comm'n v. FERC*, 653 F.2d 655, 662 (D.C.Cir.1981)). A party is "aggrieved" under § 313(b) if it satisfies both the constitutional and prudential requirements for standing. *City of Orrville*, 147 F.3d at 985; *Louisiana Energy and Power Auth. v. FERC*, 141 F.3d 364, 366 (D.C.Cir.1998); *Liquid Carbonic Indus. Corp. v. FERC*, 29 F.3d 697, 701 (D.C.Cir.1994).

■ To establish Article III standing, a party must demonstrate the following:

> (1) that the plaintiff [has] suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there [was] a causal connection between the injury and the conduct complained of—the injury [was] fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it [was] likely, as opposed to merely speculative, that the injury [would] be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *see also Solon v. Gary Community Sch. Corp.*, 180 F.3d 844, 849 (7th Cir.1999).

Here, we may resolve the standing issue by proceeding directly to the final of the three standing requirements—whether it was likely, as opposed to merely speculative, that Wisconsin's injury would be redressed if we ordered the fish entrainment and protection articles to be reinserted into Fraser's and Northern States' licensing agreements. Conspicuously, Wisconsin does not address this issue. Nevertheless, we find that even if we were to rule in Wisconsin's favor (by reversing the FERC's Reconsideration Order and re-

quiring that the FERC reinsert the fish entrainment and protection articles into the six project licenses), it is merely speculative that the ruling would redress the injury Wisconsin claims on appeal (injury to the fishery in the Flambeau River).

Clearly, Wisconsin's concern is that further studies on fish entrainment in the Flambeau River might reveal that alternative or additional measures need to be taken. We appreciate that worthy concern; however, the existing project licenses provide for that concern. Each license contains a standard "reopener" article, under which the FERC can impose additional requirements, such as fish entrainment and protection articles, should those articles become necessary. The benefit that Wisconsin would receive by requiring that the fish entrainment and protection articles be reinserted into Fraser's and Northern States' licensing agreements is too speculative, generalized, and remote to satisfy the standing requirements of Article III.

Because Wisconsin does not have Article III standing, it does not qualify as an "aggrieved" party under § 313(b) of the FPA, 16 U.S.C. § 825l(b). *See City of Orrville*, 147 F.3d at 985; *Louisiana Energy and Power Auth.*, 141 F.3d at 366; *Liquid Carbonic Indus. Corp.*, 29 F.3d at 701. Accordingly, we need not reach the merits of Wisconsin's appeal.

Appeal Dismissed for lack of standing.